1

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   J.W., a minor, by and through his parents          CASE NO. CV F 07-1625 LJO DLB
     J.E.W. and J.A.W.,
12
                         Plaintiff,                     **ORDER ON PLAINTIFF'S MOTION FOR**
13                                                      **SUMMARY JUDGMENT OF IDEA CLAIM**
                                                        (Docs. 91, 105)
14           vs.

15   FRESNO UNIFIED SCHOOL DISTRICT,

16                       Defendant.

17   _____/

18                                  **INTRODUCTION**

19          By amended motion, filed on February 26, 2009, plaintiff J.W., by and through his parents J.E.W.

20   and J.A.W. ("Student"), moves for summary judgment on his Individuals with Disabilities Education

21   Act ("IDEA"), 20 U.S.C. §1400 *et seq*., claim against defendant Fresno Unified School District

22   ("District").  Student challenges an August 14, 2007 decision made by Administrative Law Judge

23   ("ALJ") Suzanne Brown, Office of Administrative Hearings, Special Education Division, State of

24   California.  Student argues, *inter alia*, that the ALJ erred to decide that District provided Student with

25   a free appropriate public education ("FAPE"), as required by the IDEA, for the time period between

26   September 1, 2003 through September 1, 2006.  Student claims that District committed procedural and

27   substantive violations of the IDEA.  For the following reasons, this Court finds that the ALJ did not err

28   in her decision, and DENIES in full Student's summary judgment motion.

                                              1

## STATUTORY FRAMEWORK

### IDEA

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education." *Hoeft v. Tuscon Unified Sch. Dist.*, 967 F.2d 1298, 1300 (1992) (citing *Honig v. Doe*, 484 U.S. 305, 310 (1988)). The IDEA ensures that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. §1400(d)(1)(A). According to the IDEA, a FAPE is

> special education and services that–(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the school standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. §1401(9). To provide a FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education and services, conduct and implement an IEP, and determine an appropriate educational placement of the student. 20 U.S.C. §1414.

Student's FAPE must be "tailored to the unique needs of the handicapped child by means of an 'individualized educational program' (IEP)." *Hendrick Hudson Cent. Sch. Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 181 (1982) ("*Rowley*") (citing 20 U.S.C. §1401(18)). The IEP, which is prepared at a meeting between a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and, where appropriate, the child, consists of a written document containing

> (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(19). Local or regional educational agencies must review, and where appropriate revise, each child's IEP at least annually. 20 U.S.C. §§ 1414(a)(5), 1413(a)(11). In addition, "[p]arental involvement is a central feature of the IDEA." *Hoeft*, 967 F.3d at 1300. "Parents participate along with teachers and school district representatives in the process of determining what constitutes a 'free

appropriate education' for each disabled child." *Id*.

Violations of the IDEA may arise in two situations. First, a school district, in creating and implementing the IEP, can run afoul of the Act's procedural requirements. *Rowley*, 458 U.S. 176. Second, a school district can be liable for a substantive violation by drafting an IEP that is not reasonably calculated to enable the child to receive educational benefits. *Id*. Through a FAPE, "the door of public education must be opened for a disabled child in a 'meaningful' way." *Id*. at 192. District must provide Student a FAPE that is "appropriately designed and implemented so as to convey" Student with a "meaningful" benefit. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). Student alleges that District violated the IDEA's both procedurally and substantively, in a number of ways.

### State and Federal Regulations

Both state statutes and federal regulations supplement IDEA's procedural and substantive requirements. The California Education Code contains legislative findings and declarations regarding children who are deaf or heard of hearing ("DHH"). According to the California Education Code, deafness is a low-incidence disability, making up less than 1 percent of the total statewide enrollment for kindergarten through 12th grade, and requires "highly specialized services, equipment and materials." Cal. Ed. Code §§5600.5(a)(1), (2). Cal. Ed. Code §56000.5(b)(1) provides:

> Deafness involves the most basic human needs–the ability to communicate with other human beings. Many hard-of-hearing and deaf children use an appropriate communication mode, sign language, which may be their primary language, while others express and receive language orally and aurally, with or without visual signs or cues...It is essential for the well-being and growth of hard of hearing and deaf children that educational programs recognize the unique nature of deafness to ensure that all hard-of-hearing and deaf children have appropriate, ongoing, and fully accessible educational opportunities.

"It is essential" that DHH children, "like all children, have an education in which their unique communication mode is respected, utilized, and developed to an appropriate level of proficiency." Cal. Ed. Code §56000.5(b)(2). DHH students must "have an education in which special education teachers, psychologists, speech therapists, assessors, administrators, and other special education personnel understand the unique nature of deafness and are specifically trained to work with hard-of-hearing and deaf pupils." Cal. Ed. Code §56000.5(b)(3). Each DHH student should be placed in the "least restrictive environment," taking into consideration that DHH students should have a "sufficient number of language

3

mode peers which whom they can communicate and who are of the same, or approximately the same, age and ability level," that parents "are involved in determining the extent, content and purpose" of the educational program, and DHH students "have programs in which they have direction and appropriate access to all components of the educational process, including, but not limited to recess, lunch, and extracurricular and athletic activities." Cal. Ed. Code §§56000.5(b)(4), (5), (7), and 9.

As to DHH students, federal regulations also address equipment. Each public agency must ensure that hearing aides worn in school by children with hearing impairments are functioning properly. 34 C.F.R. §300.12; 34 C.F.R. §300.303. Effective October 13, 2006, each public agency must ensure that the external components of surgically implanted medical devices are functioning properly. 34 C.F.R. §300.113. However, a public agency is not responsible for post-surgical maintenance, programming, or replacement of a medical device that has been surgically implanted (or of an external component of a surgically implanted medical device). 34 C.F.R.§ 300.113.

Against this background, the Court turns to the facts and proceedings in this case.

## BACKGROUND[1]

### Factual History

At all times relevant, Student was a District resident. Student was diagnosed with severe to profound hearing loss in both ears at the age of 15 months. Accordingly, Student is eligible for special education under the IDEA as a DHH student.

### Early Education

At age 15 months, District conducted an initial assessment of Student. Based on the assessment, District staff invited Student's parents to observe the aural/oral program for DHH students at Alice Birney Elementary School ("Birney") and a sign language program at Norseman Elementary School. When Student was two years old, Student's parents chose for Student an oral method of communication and an oral education. Accordingly, Student was enrolled in Birney's pre-kindergarten DHH program.

When Student began the program at Birney, he wore a hearing aid in each ear. Student's parents learned about cochlear implants through Student's preschool teacher at Birney, who attended doctor

---

[1]The Court takes these facts from the administrative record and the ALJ's findings of fact. Disputed facts and facts relevant to a specific legal issue are presented and addressed below in the Discussion section.

appointment with Student's parents and discussed cochlear implants extensively. When he was four years old, Student received a cochlear implant in his left ear. Student's implant was "mapped" at the California Ear Institute's Let Them Hear Foundation in Palo Alto, California. Student continued to wear a hearing aid in his right ear.

Student attended District's oral program at Birney from 1998-2000, during pre-school and kindergarten. Student returned to Birney in 2001 and attended Birney's oral program during the 2001-2002 and 2002-2003 school years, for his second and third grades.

On May 20, 2003, Student's IEP convened for Student's annual IEP meeting. Staff from both Birney and Bullard Talent School ("Bullard Talent") attended the meeting.[2] The IEP team discussed whether Student's placement for the 2003-2004 school year should be in a general education fourth grade class at Bullard Talent or in the oral DHH special day class ("SDC") at Birney. Several staff expressed concerns about placement at Bullard Talent; however, Student's parents requested a full-inclusion mainstream placement at Bullard Talent. Based on this disagreement, the IEP was continued. In a May 27, 2003 letter, Student's mother complained to District program specialist Diane Beauregard ("Ms. Beauregard") that the discussion of the IEP meeting regarding Student's placement options was misplaced and should have been devoted solely to Student's Bullard Talent transition.

The IEP meeting reconvened on June 5, 2003. At the June 5, 2003 IEP meeting, the team agreed to the parents' request for a mainstream placement at Bullard Talent, and offered that placement. In addition to placement at Bullard Talent, District offered Student designated instruction and services ("DIS") of resource specialist program ("RSP") for 65 minutes per day, DHH specialist therapy for 480 minutes per month, speech-related therapy for 8 sessions per month, and a cued-speech transliterator.[3] The IEP team also offered assistive technology, including an FM system/auditory trainer to be worn during all instruction, to provide Student with amplification of his teacher's voice, and accommodations such as extended time on tests.

---

[2]Student's parents entered Student in the lottery for admission to a District magnet school, Bullard Talent School ("Bullard Talent"). Student was successful in lottery admission to Bullard Talent. At Bullard Talent, students receive academic instruction in the morning only, with afternoons devoted to visual and performing arts activities.

[3]Cued speech is a method of interpreting in which manual cues around the transliterator's mouth are used to enhance lip reading and the help the listener/reader understand where the sound is made.

**2003-2004 School Year**

Student attended Bullard Talent for the 2003-2004 school year. Student was placed in a general education fourth grade class taught by Janice Marshall ("Ms. Marshall"). Pursuant to the IEP, and while mainstreamed in the general education class, Student spent 65 minutes a day with his RSP teacher Mary Ann Dorian ("Ms. Dorian"), received DHH specialist services with Linda Shroer ("Ms. Shroer") and speech-language therapy with Lori Jern ("Ms. Jern"). In addition, District audiologist Cindy Yates ("Ms. Yates") consulted with Ms. Marshall and Ms. Dorian. Student liked Ms. Marshall, made friends at Bullard Talent and thrived socially.

Student began the 2003-2004 school year far behind other students at his grade level in language, communication, and all academic areas except for math. The IEP team convened again on October 27, 2003, and agreed that Student would receive a special education report card and would not be working towards grade level standards.

**2004-2005 School Year**

The annual IEP meeting convened on May 26, 2004. The team members discussed Student's present levels of performance and progress on his goals and objectives. The team agreed that Student would remain at Bullard Talent for his fifth grade year, with DIS of RSP services for 60 minutes a day, DHH specialist services for 720 minutes per month, speech-language therapy for 8 session per month, and a full-time cued speech transliterator. The team also agreed to accommodations such as extended time on tests and copies of his textbooks for the following year to review over the summer. District offered Student placement in a general education fifth grade class with students who had delays in reading.

Student's fifth grade class taught by Denise Stover ("Ms. Stover"). Student continued to receive RSP services with Ms. Dorian, DHH specialist services with Ms. Shroer, speech-language therapy with Ms. Jern, and a cued speech transliterator.

In late September 2004, Ms. Stover gave Student a "deficiency notice," indicating that Student was having difficulty with many subjects at the fifth grade level. Several members of the IEP team met with Student's mother informally on October 6, 2004 to discuss the deficiency notice. As a result, Student's grading was modified and Student received no further deficiency notices that year.

Student was unhappy in Ms. Stover's class.  Student resisted going to school during his fifth grade year.   In one incident, Ms. Stover made Student "pull a card" as a punishment for his classroom behavior.  Student's mother was upset by the incident.  Ms. Stover also refused Student's mother's request to give her the answer keys to Student's examinations in advance.

In May 2005, District staff conducted Student's triennial reassessment.  Student was evaluated in the areas including cognitive ability, academic achievement, attention, behavior, speech, language, auditory comprehension, auditory discrimination, listening comprehension, and lip reading.

### 2005-2006 School Year

On June 3, 2005, Student's IEP team convened for the annual IEP meeting.  District recommended referring Student to the Central Valley Diagnostic Center for further assessment, but Student's mother chose to forego that assessment.  In discussing Student's placement for the 2006-2007 school year, District staff opined that placement at Bullard Talent would not meet Student's needs.  District staff recommended placement at either a DHH SDC at Noresman Elementary School, or a regular sixth grade class at Del Mar Elementary School ("Del Mar").  Student's mother visited the proposed schools.  Subsequently, Student's mother accepted District's offer of placement at Del Mar.

Student was placed in a general education class sixth grade class at Del Mar, with RSP services taught by Denise Williams ("Ms. Williams") for 500 minutes per week, DHH specialist services with Eric Nyberg ("Mr. Nyberg") f or 720 minutes per month, and speech-language therapy for 50 minutes per week.  Student also received supports and services such as an FM system, a sign language interpreter, and weekly counseling sessions by a counselor assigned to the DHH program.

On October 19, 2005, District staff met with Student's mother for a conference.  During that meeting, the participants agreed that Student's new DHH specialist, Erik Nyberg, would teach Student sign language vocabulary during his sessions with Student.  On October 26, 2005, Student's IEP convened and added this change to Student's IEP.  The team also added goals and objectives in reading and writing, and agreed to parent's request to defer again Student's referral to the Central California Diagnostic Center.  Student's mother further agreed to change Student from a cued speech transliterator

to a sign language interpreter .[4]

During his sixth grade year, Student received deficiency notices, reporting that he was below grade level in certain subjects. Student told his counselor that he and his mother were unhappy with Del Mar because he did not have friends there, and that he wanted to go back to Bullard Talent. Student's mother was unhappy with Del Mar because, *inter alia*, Student's peers spoke Spanish on the playground.

In March 2006, Student's mother took Student to see his former Birney teacher, Carole Aguirre ("Ms. Aguirre"). Ms. Aguirre conducted a Ling 6 Sound Test on Student and determined that Student could not hear the sounds correctly. Ms. Aguirre checked Student's equipment and determined that it was working properly, but recommended an audiologist check Student's equipment. Student's audiologist at the Let Them Hear Foundation tested Student's cochlear implant and also determined that the equipment was working properly, but that Student was not accessing sounds from the implant. In April 2006, Student began receiving auditory verbal ("AV") therapy from Ms. Aguirre. Student also received consultation and some AV therapy sessions from AV therapist Nancy Sakaguchi ("Ms. Sakaguchi"), who taught Ms. Aguirre AV therapy. Student's parents privately funded the AV therapy.

**2006-2007 School Year**

On May 26, 2006, the IEP team convened for its annual meeting. The team reviewed results of informal testing by Mr. Nyberg, and discussed Student's placement options for the 2006-2007 school year. District recommended two options for Student's placement: DHH SDC at Ahwahnee Middle School ("Ahwahnee") or a mainstream placement at Student's home school, Fort Miller. Student's mother agreed to visit the SDC at Ahwahnee, but rejected placement at Fort Miller. Student's mother also requested that the District fund AV therapy for Student.

The IEP team reconvened on June 21, 2006. The District recommended placement at the DHH SDC at Ahwahnee. Student's mother rejected that recommendation, and did not sign her consent to the IEP. District denied Student's parents' request to fund Student's AV therapy for the 2006 summer.

In July 2006, at his parents' expense, Student attended a two-week summer program at Clarke School for the Deaf ("Clarke"), a private school in Massachusetts.

---

[4]Student's mother asked for an interpreted who could use both sign language and cued speech transliterating, but District indicated that no individual exists.

On August 19, 2006, Ms. Sakaguchi conducted a District-funded assessment of Student to assess Student's auditory needs and to evaluate whether Student needed AV therapy. After reviewing Ms. Sakaguchi's report, District's Manager of Special Education Programs Beth Shroeder ("Ms. Shroeder") asked Ms. Sakaguchi to recommend the frequency and duration of AV therapy that she believed Student needed. In addition, Ms. Shroeder asked Ms. Sakaguchi to offer other recommendations regarding Student's educational programming. Ms. Sakaguchi agreed to add her recommendations, and issued an amended report on August 29, 2006.

In late August 2006, Student's parents notified the District in writing that they intended to place Student at Clarke unilaterally, and that they would seek reimbursement from District for the Clarke placement.

On September 1, 2006, the IEP team convened to discuss Student's placement options for the 2006-2007 school year and Ms. Sakaguchi's report. District offered placement at the DHH SDC at Ahwahnee, proposed referring Student for assessment at the Central California Diagnostic Center, or at Northern California Diagnostic Center. Student's parents rejected District's placement offer and diagnostic referrals, and filed a due process hearing with OAH.

For the 2006-2007 school year, Student attended Clarke. Student was initially placed in a seventh grade class. In October 2006, Clarke conducted a comprehensive educational evaluation for Student. In November 2006, Student was moved from a seventh grade class to a fifth grade class. Later, while he remained in the fifth grade class, Clarke gave Student third grade level work. Student continues to progress at a slow pace. Student upgraded the cochlear implant in his left ear in January 2007, and received a cochlear implant in his right ear in March 2007.

## Procedural History

Student appeals an administrative law judge decision pursuant to 20 U.S.C. §1415. The ALJ heard this matter on May 30-31, June 1-2, 5, 7-8, 11-12, and 26, 2007 in Fresno, California. After the hearing, the parties submitted closing arguments in writing. The record was closed and the matter submitted on July 13, 2007. On August 14, 2007, the ALJ issued her Decision in the matter of *Student v. Fresno Unified School District*, OAH Case No. N2006090026 ("Decision"). In her Decision, the ALJ denied Student's claim for relief, with one exception. The ALJ found that District substantively denied

9

Student a FAPE by failing to offer extended school year services ("ESY") for the 2005 summer session. The ALJ ordered District to reimburse Student's parents for tuition, room, board, and reasonable travel expenses for the 2006 summer session.

To resolve the administrative appeal, Student moved for summary judgment on January 26, 2009, pursuant to the January 12, 2009 stipulation and order. An amended administrative record was lodge with this Court on February 6, 2009. Student filed his amended motion for summary judgment on February 6, 2009, and a further amended motion on February 26, 2009. District filed its opposition on March 16, 2009. Student replied on March 30, 2009. This Court found this motion suitable for decision without a hearing, pursuant to Local Rule 78-230(h).

## STANDARD OF REVIEW

"When a party challenges the outcome of an IDEA due process hearing, the reviewing court receives the administrative record, hears any additional evidence, and 'bas[es] its decision on the preponderance of the evidence.'" *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (2007) (quoting 20 U.S.C. §1415(i)(2)(B)). Based on this standard, "complete de novo review of the administrative proceeding is inappropriate." *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (2007). As the party seeking relief in this Court, Student bears the burden of demonstrating that the ALJ's decision should be reversed. *Clyde K. V. Pullayup Sch. Dist., No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994). In addition, the party challenging the administrative decision bears the burden of persuasion on each claim challenged. *Id.*

## Deference

In review of an IDEA due process hearing, courts give "less deference than is conventional" in review of other agency actions." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993). "How *much* deference to give state educational agencies, however, is a matter for the discretion of the courts." *Gregory K. V. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987). The Court, "in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After consideration, the court is free to accept or reject the findings in part or in whole." *Id.*; *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467 (9th Cir. 1993).

"'[D]ue weight' must be given to the administrative decision below and [] courts must not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Van Duyn,* 502 F.3d at 817 (quoting *Rowley,* 458 U.S. at 206). "[T]he amount of deference afforded the hearing officer's findings increases where they are thorough and careful." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995). This Court gives deference to an ALJ's decision "when it 'evinces his [or her] careful, impartial consideration of all the evidence and demonstrates his [or her] sensitivity to the complexity of the issues presented." *County of San Diego v. California Special Educ. Hrg. Off.*, 93 F.3d 1458, 1466 (9th Cir. 1996).

## Basic Floor of Opportunity

While a student's IEP must be reasonably calculated to provide him or her with educational benefit, school districts are required to provide only a "basic floor of opportunity." *Rowley*, 458 U.S. at 200-01. Thus, an "'appropriate' public education does not mean the absolutely best or 'potential-maximizing' education for the individual child." *Gregory K. v. Longview Sch. Dist*, 811 F.2d 1307, 1314 (1987). However, "Congress did not intend that a school system could discharge its duty under the IDEA by providing a program that produces some minimal academic advancement, no matter how trivial." *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F. 3d 877, 890 (9th Cir. 2001).

## Snapshot Evaluation

The standard for evaluating IEPs, commonly called the "snapshot" rule," is not retrospective. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). As the *Adams* court explained

> Instead of asking whether the [IEP] was adequate in light of the [Student's] progress, the district court should have asked the more pertinent question of whether the [IEP] was appropriately designed and implemented so as to convey [Student] with a meaningful benefit. We do not judge an [IEP] in hindsight; rather, we look to the [IEP's] goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer [Student] with a meaningful benefit...In striving for "appropriateness," an IEP must take into account what was, and what was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted.

195 F.3d at 1149.

## DISCUSSION & ANALYSIS

### I.      Evidentiary Matter–Judicial Notice

The Court first considers Student's challenge to the ALJ's denial of Student's request for judicial

notice. Student filed a request that the ALJ take judicial notice of a document entitled "Programs for Deaf and Hard of Hearing Students: Guidelines for Quality Standards" ("Guidelines"). The Guidelines are issued by the California Department of Education. In the request for judicial notice, Student attached a copy of the Guidelines and argued that they were subject to judicial notice pursuant to Cal. Evid. Code section 452(h). Student filed the request with his closing brief.

In addressing Student's judicial notice request, the ALJ noted:

> The fact that the CDE issued these Guidelines is not reasonably subject to dispute and is capable of immediate and accurate determination. However, the same has not been established for the contents of the Guidelines. The entire document is 200 pages long and contains extensive, technical recommendations about numerous topics related to the education of deaf and heard of hearing (DHH) students. Since the choice of methods for education of DHH students is a topic with a long history of debate and controversy, it is doubtful that the recommendations expressed in the Guidelines are not subject to dispute or are cable of immediate and accurate determination.

Ultimately, the ALJ denied Student's judicial request as untimely. The ALJ pointed out that Student failed to identify the document as a proposed exhibit "at least five business days in advance of the hearing," as required by Cal. Educ. Code section §56505(e)(7)). Student further failed to list the Guidelines in a prehearing conference statement submitted three business days prior to the prehearing conference, in violation of OAH requirements. In submitting the late request, Student did not offer "any reason why the document should be admitted despite the failure to comply with these requirements."

Pursuant to Cal. Evid. Code section 452(h), a court may take judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." "Although the *existence* of a document may be judicially noticeable, the truth of statements contained in the document and its *proper interpretation are not subject to judicial notice* if those matters are reasonably disputable." *Unruh-Haxton v. Regents of University of California*, 162 Cal. App. 4th 343, 364 (2007) (citations omitted) (italics in original).

Student acknowledges that "the ALJ was correct in determining that the contents of the guidelines cannot be judicially noticed for their truth or accuracy." Student argues that the ALJ erred in failing "to acknowledge that the guidelines could be judicially noticeable for their purpose of showing that the CDE has in fact set forth suggested guidelines for use in the education of DHH children.".

Student contends that after taking judicial notice of the existence of the Guidelines, the trier of fact could determine whether District followed those suggested Guidelines and, if not, what weight that determination carries in the ultimate decision of whether District denied Student his right to a FAPE. Student fails to address the ALJ's ruling to exclude the Guidelines as untimely.

The ALJ did not err to deny Student' request to take judicial notice of the CDE Guidelines. Student continues to provide no reason why the document should be considered despite Student's failure to comply with Cal. Educ. Code section 56505(e)(7), the OAH requirements, and the ALJ's case management order. Student's failure to comply with these requirements renders the Guidelines untimely. In addition, Student's submission of the Guidelines with his written closing argument deprived District of the opportunity to submit documents in response, to question witnesses about the Guidelines, or to raise arguments regarding the Guidelines. Accordingly, the ALJ correctly denied Student's untimely request for judicial notice of the Guidelines.

## II.     Deference to the ALJ's Thoughtful and Careful Analysis

Before discussing the merits of Student's IDEA procedural and substantive violations arguments, this Court addresses Student's position regarding the degree of deference this Court should give to the ALJ decision. *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942-43 (9th Cir. 2007). Student argues that this Court should not give deference to the ALJ's decision. District contends that this Court should afford substantial deference to the ALJ's thoughtful and careful decision.

This Court gives deference to an ALJ's decision "when it 'evinces his [or her] careful, impartial consideration of all the evidence and demonstrates his [or her] sensitivity to the complexity of the issues presented." *County of San Diego v. California Special Educ. Hrg. Off.*, 93 F.3d 1458, 1466 (9th Cir. 1996). As the Ninth Circuit Court of Appeals explained in *Napa Valley*, 496 F.3d at 942-43, a Court "treat[s] a hearing officer's findings as "'thorough and careful' when the officer participates in the questioning of witnesses and writes a decision contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions."

The ALJ's 38-page decision, rendered after a ten day hearing, contains a detailed factual background and analysis. The ALJ explains her legal conclusions thoroughly, including citations to the relevant facts and discussion of the applicable law. Additionally, the ALJ was involved actively in the

hearing. The ALJ questioned many witnesses, both to clarify responses as well as to elicit follow-up responses. Accordingly, this Court shall give due weight to the ALJ's decision and shall give particular deference to the ALJ's decision to the extent it was "thorough and careful."

**III. Substantive Issues**[5]

    **A. For the 2003-2004, 2004-2005, and 2005-2006 school years, did the District fail to assess Student's unique needs in the area of audition skills (which skills affect his ability to access sounds and words) and therefore affect his ability to learn to read)?**

According to the IDEA and California's Education Code, each student must be assessed in all areas of his or her suspected disability. 20 U.S.C. §1414(b)(3); Cal. Educ. Code §56320(f). Student appeals the ALJ's conclusion that the District assessed Student in all areas of suspected disability in the area of audition skills for the 2003-2004, 2004-2005, and 2005-2006 school years.

The ALJ concluded that the District properly assessed Student during the relevant time period "by conducting testing such as the TAC, the W-J-III Listening Comprehension subtest, the Ling 6 Sound Test, the Wepman Auditory Discrimination Test, and other assessment tools." The ALJ arrived at her conclusion based on the following findings of fact, in pertinent part:

        In the 2003-2004 school year, the assessment information regarding Student's audition skills consisted primarily of results from the May 2002 triennial reassessment. In that reassessment, Student's DHH SDC teacher, Ms. Wasser, administered the Test of Auditory Comprehension (TAC), and also the Listening Comprehension subtest of the Woodcock-Johnson-III. Ms. Wasser, DHH specialist Linda Shroer, and speech-language pathologist Lori Jern also used informal measures to regularly assess Student's hearing and listening skills, such as regularly administering the Ling 6 Sound Test.

        For the 2004-2005 school year, District did not conduct additional formal assessment of Student's audition skills. In May 2005, District assessed Student's audition skills as part of the triennial reassessment. DHH specialist Linda Shroer administered the TAC to measure Student's auditory comprehension, and the Wepman Auditory Discrimination Test to measure his auditory discrimination. Ms. Shroer also assessed Student in the area of listening comprehension, by testing his ability to repeat sentences and answer question about a three-paragraph short story from the Read Naturally program. In addition, speech-language pathologist Lori Jern conducted a language assessment that included testing in expressive language and semantics.

    [5]For organizational purposes, this Court will address each issue as set forth in the ALJ's Decision. The parties' arguments will be considered within the applicable issue. This Court carefully reviewed and considered all arguments, points and authorities, declarations, testimony, statements of undisputed facts and responses thereto, objections and other papers filed by the parties. Omission of reference to an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the argument, document, objection or paper. This Court thoroughly reviewed, considered and applied the evidence it deemed admissible, material and appropriate for summary judgment.

In May 2006, District speech-language pathologist Jenny Slonski conducted a comprehensive language assessment of Student's receptive vocabulary, expressive vocabulary, and language processing skills. In August 2006, District funded an independent educational evaluation by Ms. Sakaguchi, a certified AV therapist. Ms. Sakaguchi assessed Student in areas including auditory comprehension, auditory discrimination, listening comprehension, and comprehension of language structures.

In addressing Student's argument that District should have made a greater assessment of Student's auditory skills prior to August 2006, the ALJ found "little evidence" to support this claim:

> Student' points to the testimony of Dr. Maura Martindale, an expert in oral education of DHH children, who testified that the triennial reassessments should have included a language sample to measure Student's mean length of utterance and syntactic production. However, this testimony did not establish that the absence of the language sample constituted a failure to assess in audition skills. The same applies to Dr. Martindale's testimony that she would have liked to see a measure of Student's pragmatic language. While such testimony established that additional measurement tools may have been helpful, the evidence did not prove any failure to assess.

Additionally, the ALJ noted that "in June 2005, Student's parents decline the District's proposal to refer Student for further assessment at the Central California Diagnostic Center."

### 1. Restatement of Issue

Student asserts that ALJ committed error by restating the assessment issue. Student claims that the ALJ restated this issue in a way that "varied slightly" from his articulation of them in the Prehearing Conference Order. In a footnote, Student points out that his issue of "assessment" included "addressing and assessing" Student's needs.

In her decision, the ALJ notes that she "slightly reorganized the issues by consolidating the assessment claims into a single issue." The ALJ's consolidation of the assessment claim over the 2003-2006 time period is appropriate, as the IDEA requires a *triennial* assessment of Student, with certain inapplicable exceptions. 20 U.S.C. §1414(a)(2)(b). As such, District was not required to assess Student every year. Consolidation of the issue did not change the ALJ's consideration of Student's arguments. The ALJ considered each assessment over the relevant period of time, including the 2002, 2003, and 2005 assessments of Student. In addition, the ALJ did not ignore Student's claim that District failed to "address" Student's needs. Rather, the ALJ considered Student's failure to address arguments separately

1  for each school year.[6]  Thus, the ALJ's reorganization was inconsequential to Student.  Accordingly, the
2  ALJ properly reorganized the assessment issue.

3  **2.    Merits of Student's Arguments**

4          District must reassess a special education student at least once every three years, and not more
5  frequently than one time per year, unless the parents and district agree otherwise. 20 U.S.C.
6  §1414(a)(2)(b).  A reevaluation occurs "if the local educational agency determines that the educational
7  or related service needs, including improved academic achievement and functional performance, of the
8  child warrant a reevaluation...or if the child's parents or teacher requests a reevaluation." 20 U.S.C.
9  §1414(a)(2)(1); Cal. Educ. Code §56381(a).   Reassessment requires parental consent. 20 U.S.C.
10  §1414(c)(3).  As the ALJ set forth in the above-quoted findings of fact, Student was assessed in May
11  2002, May 2003, and May 2005.  These tests included the Test of Auditory Comprehension and the
12  Woodcock Johnson III.  Through these examinations, Student's abilities in audition, reading, written
13  language, and math were evaluated were assessed.

14          District assessed Student in the area of audition in accordance with the IDEA.   District
15  administered the Test of Auditory Comprehension ("TAC"),  the Listening Comprehension subtest of
16  the Woodcock-Johnson-III and the Wepman Auditory Discrimination Test.  In addition to these formal
17  assessments, District staff used informal measures to regularly assess Student's hearing and listening
18  skills.

19          Student contends that the ALJ's conclusion and facts are flawed on this issue.  Student challenges
20  the ALJ's finding of fact that Ms. Shroer and Ms. Jern used "informal measures" to assess Student's
21  audition skills regularly.  In particular, Student asserts the ALJ erred because Ms. Jern testified that she
22  did not conduct Ling 6 Sound Tests on Student.

23          In so arguing, Student misunderstands the ALJ's finding of fact.  The ALJ found: "Ms. Wasser,
24  DHH specialist Linda Shroer, and speech-language pathologist Lori Jern also used informal measures
25  to regularly assess Student's hearing and listening skills, such as regularly administering the Ling 6
26  Sound Test."  In this sentence, the ALJ found that Ms. Wasser, Ms. Shroer, and Ms. Jern used informal

27

28          [6]This Court, as the ALJ did, considers each "failure to address" argument separately below.

measures to assess Student's hearing and listening skills. At the end of the sentence, the ALJ included one example of such informal measures–the Ling 6 Sound Test. Ms. Wasser testified that she performed informal measures on Student, and performed the Ling 6 Sound Test daily. The ALJ then described some of the informal measures used by Ms. Shroer and Ms. Jern. For example, the ALJ found that "Ms. Shroer also assessed Student's listening comprehension, by testing his ability to repeat sentences and answer questions about a three-paragraph short story from the Read Naturally program. In addition, speech-language pathologist Ms. Jern conducted a language assessment that included testing in expressive language and semantics." Thus, the ALJ did not base her conclusion on an erroneous fact that Ms. Jern performed the Ling 6 Sound Test. The evidence supports the ALJ's challenged factual finding that Student was assessed in his area of need. Accordingly, Student has not satisfied his burden to prove that the ALJ's conclusion on this issue should be overturned.

**B.** **For the 2003-2004 school year, did the District deny Student a FAPE by failing to:**
    **1.** **Address Student's unique needs by developing appropriate goals and objectives in the area of audition skills, audiology, auditory language development, building language, and learning the English language**

Student asserts that the District denied Student a FAPE by failing to address his unique needs by developing appropriate goals and objectives in the area of audition skills, audiology, auditory language development, building language, and learning the English language. Those goals and objectives are written in the annual IEP. An annual IEP is a statement of measurable annual goals designed to: (1) meet the individual's needs that result from the individual's disability to enable the pupil to be involved in and make progress in the general curriculum; and (2) meet each of the pupil's other educational needs that result from the individual's disability. 20 U.S.C. §1414(d)(1)(A)(iii); Cal. Ed. Code §56345(a)(2). The IEP must be designed to meet Student's unique needs and must be reasonably calculated to enable the child to receive an educational benefit. *Rowley*, 458 U.S. at 206-07. "The IEP is the hallmark of the IDEA. It provides a detailed assessment of a student's abilities and needs and then lays out a program to meet that student's educational goals." *Jaynes v. Newport News Sch. Board*, 33 IDELR 121, 2 (E.D. Va. 2000). The May 20, 2003 IEP and June 5, 2003 IEP contained one goal in each of the following areas: reading (phonics); reading (sight words); reading (comprehension); oral language; listening skills; vocabulary development; attention span while using an educational interpreter;

17

misarticulations (vowels); misarticulations ("L" consonant); and breath control. The October 27, 2003

IEP adjusted these goals slightly to add more work on vocabulary and language expansion.

a.      Statute of Limitations

Before addressing the merits of the 2003-2004 IEPs, the Court notes that based on rulings by the

ALJ and this Court, the applicable statute of limitations began to run on September 1, 2003. District

argues that since an IEP is to be judged by the "snapshot rule," Student's challenge to the design of the

IEPs developed outside of the limitations period is time-barred. In response, Student characterizes

District's statute of limitations argument as "baseless;" denies District's assertion that Student's

challenges only the "design" of the program; fails to articulate what Student's challenge is, if not design;

fails to explain how this Court can consider the untimely IEPs; and "acknowledges that his remedies and

request for compensatory education are limited to the three year statute of limitation."

In its Order on Defendant's Second Motion to Dismiss, *J.W. v. Fresno Unified Sch. Dist.*, 570

F.Supp.2d 1212, 1221-22 (E.D. Cal. 2008), this Court ruled:

> The applicable statute of limitations for Plaintiff's IDEA claim is three years from the
> date of the filing of the due process request. Cal. Educ. Code §5605(l) (2006).[7] Plaintiff
> initiated his request on September 1, 2006. Thus, the statute of limitations bars all issues
> arising before September 1, 2003. Plaintiff concedes that he alleges facts that fall outside
> the IDEA's statute of limitations. Plaintiff points out that although the facts alleged to
> occur prior to September 1, 2003 are time-barred, the ALJ allowed Plaintiff "to challenge
> the services the District provided within the three-year statute of limitations based on "an
> event occurring prior to September 1, 2003; namely, the May 20, 2003 [individualized
> educational program ("IEP")]." Order Granting in Part [District's] Motion to Dismiss
> ("Order"), Declaration of Levine, Exhibit E, p. 2. Thus, "[w]hile the Complaint contains
> information regarding [Plaintiff] and the District that occurred before September 1, 2003,
> this information is for background purposes regarding the District's knowledge of
> [Plaintiff's] hearing and language impairments." Order, p. 3. This Court agrees that facts
> alleged prior to September 1, 2003 are barred by the IDEA's statute of limitations.
> Plaintiff may not challenge conduct that occurred prior to that date, but may rely on
> allegations of events prior to September 1, 2003 for background purposes.

Accordingly, Student's challenges to the May and June 2003 IEPs are time-barred. The Court will

consider Student's challenge the design of the October 2006 IEP.

b.      Failure to Assess and Address

Student argues that District's failure to assess Student's audition skills made District unable to

---

[7]On October 9, 2006, the statute of limitations of due process filings became two years. 34 C.F.R. §300.507(a)(2);
Cal. Educ. Code §5605(l) (2008).

develop goals to address Student's unique needs. As discussed more fully above, however, District's assessment of Student was appropriate. From the results of the 2002 and 2003 TAC and Woodcock-Johnson assessments, District appropriately identified that Student had unique needs in language and audition. Each of the goals and objectives in the October 2003 IEP relate to these unique needs, as they are directed at reading, oral language, listening skills, vocabulary development, speaking, language expression and articulation.

c.     Lack of Appropriate Goals and Too Few Goals

Student argues that District lacked appropriate goals and had too few goals to address Student's needs. Student relies on the testimony his expert witness, Dr. Maura Martindale ("Dr. Martindale") to argue that Student was denied a FAPE. Student attacks the ALJ's reliance on Ms. Dorian and Ms. Jern, and erroneously argues that the ALJ ignored Dr. Martindale's testimony. The ALJ found:

> Dr. Martindale was an extremely knowledgeable witness with extensive experience and significant expertise in the field of oral education for DHH children. Her testimony was candid and credible. However, for the following reasons, her testimony did not establish that District denied Student a FAPE for the 2003-2004 school year. Dr. Martindale reached her conclusions solely based upon her review of Student's records, including IEPs, assessment reports, and audiological records. She never assessed or met with Student, and never observed his educational program. In contrast, other credible witnesses such as Student's RSP teacher, Ms. Dorian, and Student's speech-language pathologist, Ms. Jern, testified that these goals were appropriate to address all of Student's educational needs. After working with and assessing Student, they were very familiar with Student's needs during the time period at issue. While Ms. Dorian and Ms. Jern lacked the extensive expertise of Dr. Martindale, they were still qualified, experienced, and knowledgeable professionals. Moreover, Dr. Martindale's measurement of adequate progress was that Student needed to develop language at a level commensurate with his hearing peers. This standard is higher than the "meaningful educational benefit" standard applicable to this legal analysis.

This Court "can summarily dismiss...[Student's] objections as impermissible attempts to second-guess the [ALJ's] characterization and weighing of the evidence." *Napa Valley*, 496 F.3d at 942. The Court refuses to question the ALJ's reliance on the testimonies of Ms. Dorian and Ms. Jern, which included observations of Student in the classroom, rather than Dr. Martindale's testimony. *See Ms. S. v. Vashon Island. Sch. Dist.*, 337 F.3d 1115, 1127-28 (9th Cir. 2003) (district court defers to ALJ's credibility determinations). Dr. Martindale never met with Student or District teachers and staff who worked with Student. Dr. Martindale never observed Student's physical environment or his behavior. Dr. Martindale's opinion was based solely on her review of the written IEPs, progress reports, and

examination results. Moreover, Dr. Martindale's standard was higher than required by the applicable law. Additionally, the ALJ's "weighing of the evidence was consistent with the requirement that the IEP team review "[c]urrent classroom-based assessments and observations' and "[o]bservations by teachers and related service providers[.]" *Napa Valley*, 496 F.3d at 943 (quoting 34 C.F.R. §300.533(a)(ii)-(iii)). Accordingly, the ALJ did not err to find that District provided Student a FAPE for the 2003-2004 school year, based on the

**2.** **Offer or provide a program and services that were reasonably calculated to meet his auditory and oral needs, due to the District's offer of a mainstream placement for most of Student's time**

Student argues that mainstream placement of Student was inappropriate and the services and accommodations provided were insufficient. Student argues that ALJ erred because: (1) her conclusion about the Student's parents current position is inconsistent with federal and state law; (2) mainstreaming was an inappropriate placement; (3) the limited services provided to Student were insufficient;(4) District staff's use of visual stimuli was not reasonably calculated to meet Student's auditory and oral needs; and (5) District staff lacked necessary qualifications and training.[8] The Court considers each argument below.

### a. Parents' Incongruous Position

In anticipation of the 2003-2004 school year, District provided Student's parents with a continuum of alternative placements, as required by 34 C.F.R. §300.551. District suggested Student be placed in either Birney's DHH SDC program or Bullard Talent, with related services, aid and support. District team members favored the Birney placement; however, Parents rejected District's offer of placement at Birney, and demanded that Student be placed at Bullard Talent. Student's mother was so angry that the District considered placing Student at Birney, that she left the May 20, 2003 IEP team meeting in tears. Student's parents then sent a letter to Ms. Beauregard, District Program Specialist, dated May 27, 2003, which reads, in relevant part:

> Reflecting on the IEP meeting for [Student] last week questions and concerns have arisen that we would like to address:

---

[8]Student asserts these arguments for each school year. The Court's analysis applies to each school year, as discussed more fully below.

It was quickly apparent the meeting was going to be focused on the pros and cons of Birney's program over Bullard Talent, and not on the program option, and resources necessary for [Student's] successful transition.

[We] are still unclear why the focus and direction of this IEP meeting was centered on the supposition that a decision has not been made. I believe the discussion of the merits of both schools was inappropriate for an IEP transition/annual review meeting.

Our most serious concern is the disregard for [Student]'s IEP and the prevention of [Student] being mainstreamed.

At the June 5, 2003 IEP meeting, District agreed to the parent's request to mainstream Student at Bullard Talent, with additional services and supports. Student now argues that District's offer of mainstream placement at Bullard Talent denied Student a FAPE.

District argues Student's position that District violated the IDEA by offering placement at Bullard Talent is disingenuous and should be denied on grounds of equitable estoppel, laches, waiver, and unclean hands. District contends that Student's parents' consent on the mainstream placement precludes their challenge of that placement in this motion. District points out that the placement offer was made at the insistence of Student's parents, and suggests that if Student's parents disagreed with the appropriateness of District's offers, Student's parents should have refused to consent and filed for a due process hearing. Relying on *CM v. Bd. of Public Educ. of Henderson County*, 184 F. Supp. 2d 466, 483 (W.D. N.C. 2002), District argues that Student's parents waived their right to challenge the IEPs to which they consented. District contends that Student's parents bad faith conduct should bar this Court from providing them equitable relief, pursuant to 20 U.S.C. §1412(a)(10)(C)(iii)(III).[9]

District's arguments are unpersuasive. The *Henderson County* court did not rule that a claim was precluded or waived based on a parent's consent to an IEP. Rather, the court ruled that a school district was not required to provide parents with due process notice because those parents had not expressed that they were "aggrieved" by the school's action. *Henderson County*, 184 F. Supp. 2d at 483. Thus, the ruling does not support District's assertion.[10]

Student deflects District's arguments. Student contends that "this case is not about the parents'

---

[9]Although District offers this multitude of legal arguments, District only develops its argument related to waiver.

[10]Although District does not raise the issue, this Court notes that the placement decision was made outside of the statute of limitations.

21

requests or insistence on a certain methodology, but instead it's about whether the District developed and implemented an IEP that was reasonably calculated to provide [Student] a meaningful educational benefit." Student argues that parents "do not have veto power over any individual IEP provision," and when consensus cannot be reached, District has the duty to formulate an IEP to the best of its ability.

Student's deflection ignores settled IDEA law. Parental participation in the development of an IEP is the cornerstone of the IDEA. *Winkleman v. Parma City Sch. Dist.*, 550 U.S. 516, 127 S.Ct. 1994, 1999-2004 (2007); *see also, Hoeft*, 967 F.3d at 1300 ( "Parental involvement is a central feature of the IDEA."). District is required to consider Student's parents wishes in developing its IEP proposals. *N.L. v. Knox Co. Schs.*, 315 F.3d 688, 693-94 (6th Cir. 2003). Accordingly, while the claim is not waived, Student's parents insistence on mainstreaming at the time the IEP was made supports the ALJ's conclusion that District provided Student a FAPE, as discussed more fully below.

### b. Decision to Mainstream

"The language of the IDEA...clearly indicates a strong preference for 'mainstreaming,' i.e. educating handicapped children alongside non-handicapped children in a regular educational environment."*Poolaw v. Bishop*, 67 F.3d 830, 834 (9th Cir. 1995) (citing *Rowley*, 458 U.S. 176, 188-89). "Disabled children, to the maximum extent appropriate, should be educated with children who are not disabled, i.e., they should be mainstreamed. 20 U.S.C. §1412(a)(5)(B)..." *Seattle Sch. Dist. v. B.S.*, 82 F.3d 1493, 1500 (9th Cir. 1996). 20 U.S.C. §1412(a)(5)(B) requires:

> To the maximum extent appropriate, children with disabilities...are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

"In carrying out this directive, the state educational agency must develop and implement an IEP aimed at providing each disabled child with a [FAPE] in the least restrictive environment." *Poolaw*, 67 F.3d at 834 (citing 34 C.F.R. §300.550 et seq.).

The question whether to educate a handicapped child in the regular classroom or to place him in a special education environment is necessarily an individualized, fact specific inquiry. In each case, the apparent tension between the IDEA's clear preference for mainstreaming and its requirements that schools provide individualized programs tailored to the specific needs of each disabled child must be

balanced. 20 U.S.C. §§ 1401, 1414(a)(5); *see also Oberti*, 995 F.2d at 1214; *Daniel R.R.*, 874 F.2d at 1044-45. In considering whether the District proposed an appropriate placement for Student, the Court balances four factors: "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect Student had on the teacher and children in the regular class; and (4) the costs of mainstreaming Student." *Sacramento City Uni. Sch. Dist., Bd. of Educ. v. Rachel H.*, 14 F.3d 1398, 1404 (9th Cir. 1994) ("*Rachel H.* factors"). "This analysis directly addresses the issue of the appropriate placement for a child with disabilities under the requirements of 20 U.S.C. § 1412(5)(B)." *Id*.

i.      Educational benefits of placement in full-time regular class

The ALJ found that the general education class offered Student some academic benefits, such as language development from communication with typically developing peers. The general education class also provided Student with significant challenges, such as the fast pace of the academic instruction. The ALJ acknowledges that there was some indication that greater educational benefits might have been available at the Birney DHH SDC claim, but the limited evidence on that point was too sparse to establish that conclusion.

ii.      Non-academic benefits of general education placement

The non-academic benefits of mainstreaming Student were significant. According to Student's mother, Student "adjusted beautifully" and "was making friends" in his Bullard Talent fourth grade class. Student's mother acknowledges that "socially he'd had a nice transition." Student played on the soccer team and his self-esteem improved.

iii.      Effect Student had on teacher

Student's fourth grade teacher, Ms. Marshall, established that Student had a positive effect on his fourth grade teacher and classmates.

iv.      Cost of mainstreaming Student

There is no evidence about the cost of mainstreaming Student.

v.      Balancing

Having balanced the above factors, this Court finds District's offer to mainstream Student was reasonably calculated to provide Student a benefit and was appropriate in light of the information

available to the IEP team at the June 2003 meeting. Student's parents strongly preferred the mainstream option. Knowledgeable and credible witnesses, such as Student's fourth grade teacher, Ms. Marshall, and District school psychologist Tim Conway established that the offer was designed to meet Student's unique needs and was reasonably calculated to provide Student with a benefit. Although Student had difficulty hearing in the general education class, supports and services such as a cued speech transliterator and FM system were designed to address those needs. Similarly, RSP, DHH and speech-language pull-out services were designed to support his learning in the general education classroom and address his IEP goals in an intensive, one-on-one setting. Thus, Student was placed in least restrictive environment appropriate to Student's needs. Mainstreaming for most of the school day offered Student the opportunity to develop language through communication with his typically-hearing peers. Socializing with this typically-hearing peers further provided Student with non-academic benefits. Since Student's mode of communication was oral, the oral approach in general education for most of the day suited Student's needs. *See, A.U. v. Roane Co. Bd. of Educ.*, 501 F. Supp.3d 1134, 1137-38 (E.D. Tenn. 2007) (noting the importance of spending as much time as possible with typically developing peers for children with cochlear implants); *see also*, Cal. Ed. Code §56000.5. Considering all of the evidence, this Court finds that District's offer of a mainstream placement did not violate the IDEA.

### c.    Insufficient Services

At the June 5, 2003 IEP meeting, District offered to mainstream Student at Bullard Talent, and to provide the following services and supports: DIS of RSP for 65 minutes per day, DHH specialist therapy for 480 minutes per month, speech-related therapy for 8 sessions per month, and a cued-speech transliterator. The IEP team also offered assistive technology, including an FM system/auditory trainer to be worn during all instruction to provide Student with amplification of his teacher's voice, and accommodations such as extended time on tests.

Student claims that there was "overwhelming testimony" that these services were insufficient, but fails to cite to such testimony. Student fails to identify what services and accommodations provided were insufficient. Student's points out that his expert, Dr. Martindale testified that based on Student's significant delays in entering the Fourth grade, he would need a great deal of support to understand all

information provided by the teacher. Student ignore's Dr. Martindale's testimony that District provided Student with a great deal of services. Moreover, Student did not identify insufficient services as an issue at the administrative level and is precluded from raising it here. For these reasons, Student's insufficient services argument is denied.

### d. Methodology of Education

Student argues that District's use of visual stimuli was inappropriate and undermined Student's mode of communication. "The IDEA's broad mandate to provide handicapped children with a [FAPE] designed to meet the unique needs of each handicapped child is fairly imprecise in its mechanics. This vagueness reflects Congress' clear intent to leave educational policy making to state and local education officials. *See Rowley*, 458 U.S. at 207. School officials therefore retain maximum flexibility to tailor education programs as closely to the needs of each handicapped child." *Poolaw*, 67 F.3d at 834. In addition, those working with Student in the educational environment testified that Student was a visual learner and the use of visual supports provided a benefit to Student in acquiring language and concepts. Moreover, Student's parents consented to the goals and objectives as written, including the use of visual stimuli. Given the deference to the school officials to tailor the educational program to the needs of the child, this Court rejects Student's argument.

### e. Lack of Qualifications

According to Student: "Although most District staff appeared to have good intentions in their attempts to educate [Student], their attempts were thwarted by their own lack of experience and knowledge." Student asserts that many of Student's teachers and specialists were inexperienced with working with a DHH student with a cochlear implant. Student argues that this inexperience made District staff unable to provide Student with a meaningful education.

District points out that Student's IEP teams were "richly staffed with educators with expertise in educating DHH students, including those whose modes of communication were primarily oral." For example: Ms. Shroer has held the position of DHH specialist for 21 years, has a DHH specialist credential and a master's degree in DHH education. Ms. Jern has been a speech and language pathologist for 26 years, has a master's degree in communicative disorders, and holds a certificate of clinical competency with the national organization for speech and hearing. Ms. Dorian has been an RSP

teacher for 14 years, has worked in special education for over 30 years, holds a master's degree in communicative disorders, and credentials in hearing, speech and hearing, and learning resources. In addition, Ms. Dorian attended training sessions at Valley Children's Hospital to learn about working with children with cochlear implants. Ms. Slonski, Student's sixth grade speech and language therapist during sixth grade at Del Mar has a master's degrees in communicative disorders and speech and language pathology, a Certificate of Clinical Competence from the American Speech-Language-Hearing Association, and holds a California rehabilitative services credential. Mr. Nyberg has a bachelors's degree in deaf education and a California teaching credential for the DHH. He also holds a master's degree in American Sign Language in English interpretation and a master's degree in deaf education.

This Court finds that District staff working with Student were knowledgeable and qualified in the area of DHH students and communicative disabilities. The skills of this staff were appropriate to help Student in the area of his unique needs, including hearing and audition. Accordingly, Student's claim that District staff lacked appropriate qualifications and experience is denied.

### 3. Offer ESY services

Extended year services were offered to Student for the 2004 summer term. According to Student's mother, District offered an "intervention summer school" for ESY 2004. The summer school "was with regular and normal hearing children who had disabilities...[or] were behind in reading." Student was enrolled in the 2004 ESY program, and he attended for three days. Additionally, the October 2003 and May 2004 IEPs reflect that ESY services were offered. Thus, Student's assertion that District failed to offer ESY services for the 2004 summer are unfounded.

In addition, to the extent Student failed to raise an additional claim regarding 2004 ESY services at the administrative level, Student's claim is denied for failure to exhaust administrative remedies. This Court lacks subject matter jurisdiction over claims Student failed to raise in the relevant administrative procedure. *Handberry v. Thompson*, 446 F.3d 335, 343 (2nd Cir. 2006). Student argues that District failed to offer appropriate ESY services for the summer of 2004. However, Student framed this issue as a failure to offer ESY placement, not services, as reflected in the Prehearing Conference Order. Student filed a Request for Clarification of Issues, in which Student raised issues regarding the way the ALJ organized the statement of issues in the May 17, 2009 Order Following Prehearing Conference.

In his Request for Clarification, Student failed to raise the issue of ESY services, as reflected in both Student's Request and the ALJ's May 29, 2007 Order Granting in Part and Denying In Part Student's Motion to Clarify Issues. Thus, the ALJ properly refused to consider new issues Student raised in his written closing argument.[11] Because Student failed to exhaust this issue at the administrative level, this Court lacks jurisdiction to consider it. Accordingly, Student's claim on this issue is dismissed.

**C.    For the 2004-2005 school year, did the District procedurally deny Student a FAPE by:**

        **1.    Failing to Convene an IEP team meeting after October 6, 2004 parent conference**

Student argues that District procedurally violated the IDEA by failing to convene an IEP team meeting after the October 6, 2004 conference. District must comply procedurally with the IDEA. *Napa Valley*, 496 F.3d at 938. Student is denied a FAPE "only when the procedural violation results in the loss of educational opportunity or seriously infringes the parents' opportunity to participate in the IEP formation process." *Id.* (quoting *W.F. v. Bd. of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992)). "[N]ot all procedural violations deny the child a FAPE." *Napa Valley*, 496 F.3d at 938. "IDEA procedural error may be held harmless[.]" *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 652 (9th Cir. 2005).

On October 6, 2004, in response to Student's receipt of a deficiency notice by his teacher, members of the IEP team held a conference with Student's mother. The deficiency notice indicated that Student was having academic difficulty. At the conference, participants discussed changing the type of interpreter Student used, from cued speech transliterator to a sign language interpreter. Student's mother requested an interpreter who could do both cued speech transliteration and Signing Exact English ("SEE") interpretation. According to a conference summary, "an IEP will be scheduled after [program specialist] Frankie Fox speaks w/[program specialist] Dianne Beauregard about a [SEE] sign assistant and to rewrite some goals/obj and write a behavior plan." Student's mother testified that this entire

---

[11]The ALJ noted that the "Decision cannot grant Student relief for a claim that was not part of the hearing. In any event, a procedural claim on this point would not succeed...There is no evidence or argument establishing how the IEP's lack of details regarding the ESY program resulted in the loss of educational opportunity or seriously infringed on the parents' opportunity to participate in the IEP process." Similarly, in this motion, Student fails to argue, or establish, a loss of educational opportunity based on the lack of details in the IEP for the 2004 ESY services.

statement related to the considered change in interpreter/transliterator for Student.

After the October 6, 2004 meeting, Student's grading was modified and Student did not receive any more deficiency notices. Also after the meeting, Ms. Fox learned from Ms. Beauregard that a SEE sign interpreter was not available. Thus, the IEP team did not convene to discuss a change of interpreter. Student's IEP did not reconvene until June 3, 2005. Student's parents did not request an IEP team meeting after the October 6, 2004 conference.

In her ruling, the ALJ cited Cal. Educ. Code §56343.5 to assert the following conclusion of law: "If a parent request an IEP team meeting to review an IEP, the meeting shall be held within 30 calendar days from the date of receipt of the parent's request, not counting exceptions for school vacations." Based on the testimony and this statute, the ALJ concluded that the "Statement in the Conference Summary notes that the IEP team would convene in the future was not a request by the parent for an IEP team meeting, and thus, the 30-day timeline was not applicable." Student erroneously argues that the

> ALJ's Legal conclusion was based only on a portion of Ed. Code 56343.5, in that she limited her decision by citing that the District was required to hold an IEP team meeting when the parent makes a request. However, 56343.5 also states that an IEP team shall meet whenever the pupil demonstrates a lack of anticipated progress or when the parent or teacher requests a meeting to develop, review, or revise the IEP, or at least annually to review pupil's progress.

Contrary to Student's assertion, Cal. Educ. Code §56343.5, entitled "Meetings Requested by Parents," is limited to the procedural requirements for convening and IEP meeting when requested by a student's parents. Thus, the ALJ's conclusion of law was not erroneous. The Court agrees with the ALJ's further conclusion that "It is not apparent which procedural requirement the District violated in this regard, and Student does not point to any particular legal provision." Student continues to fail to point to a legal provision that District violated in failing to convene an IEP meeting after the October 6, 2004 conference. Accordingly, Student has failed to establish that the failure to hold an IEP meeting following the October 2004 conference constituted a procedural violation.

> **2.   Unilaterally implementing services to change his mode of communication (by beginning to teach Student sign language) without parents' consent**

Student contends that District staff's use of sign language with Student during the 2004-2005 school year constituted an impermissible change to his mode of communication. The parent of a special

28

education student must consent to the special education placement and services in an IEP before the placement and services can be implemented. 20 U.S.C. §1414(a)(1)(D); Cal. Ed. Code §56346(e). Among the factors that an IEP team must consider in developing an IEP for a DHH student is the student's and family's preferred mode of communication. 20 U.S.C. §1414(d)(3)(B)(iv); Cal. Ed. Code §56341.1(b)(4). Student's parents' preferred mode of communication for Student was oral.

Pursuant to the May 26, 2004 IEP, Student had a cued speech transliterator to support his oral program, directions would be given both verbally and visually, with additional cues as needed. The IEP did not include the use of sign language. Stephanie Maxwell, Student's cued speech transliterator, started to use SEE to augment the cued speech she used with him. DHH specialist Ms. Shroer reported that she used signs with Student "when introducing new concepts and vocabulary." Ms. Shroer testified that she occasionally used sign as a visual tool after obtaining consent from Student's mother. Student's mother acknowledged that she agreed to try sign language because she was willing to try anything that might work.

This Court agrees with the ALJ that "Student did not establish that this occasional use of sign language constituted a chance in his mode of communication without his parents' consent." Student's primary mode of communication remained oral. For the 2004-2005 school year, Student was placed in a mainstream general education class in which Student's teacher and peer students communicated orally. Student communicated orally during his general education classroom time, recess and lunchtime. Student communicated orally with his special education teachers, aside from District staff's occasional use of sign language to introduce new concepts or to give Student additional visual aids. Student produces no evidence to substantiate the claim that Student's mode of communication was changed unilaterally. Additionally, Student's mother consented to the use of sign language as a visual aid. Accordingly, Student fails to persuade the Court that Student's parents' procedural due process rights were violated by a unilateral change of Student's mode of communication in the 2004-2005 school year.

**D.    For the 2004-2005 school year, did the District substantively deny Student a FAPE by failing to:**
    **1.    Address his unique needs by developing appropriate goals and objectives in the areas of audition skills, audiology, auditory language development, building language, and learning the English language**

Student argues that District's failure to assess Student's audition skills made District unable to

29

develop goals to address Student's unique needs. As discussed more fully above, however, District's assessment of Student was appropriate. The May 2004 IEP contained the following goals: reading (phonics)/listening skills; reading comprehension; oral language; written language, language expression, listening skills; vocabulary expansion/language development; attending to his interpreter and teacher; and two goals in misarticulations. Each of the goals and objectives in the June 2004 IEP relate to Student's unique needs, as they are directed at reading, oral language, listening skills, vocabulary development, speaking, language expression and articulation. Dr. Martindale testified that these goals were fine, but too few. However, District staff testified that Student was unable to reach all of these goals set out by the District, as discussed more fully below. Thus, there is no evidence that more goals would have provided a meaningful educational benefit to Student. Accordingly, District addressed Student's needs by developing appropriate goals and objectives for the 2004-2005 school year.

### 2. Offer or provide a program and services that were reasonably calculated to meet his auditory and oral needs, due to the District's offer of a mainstream placement for most of Student's time

Student again argues that District should not have agreed to Student's parents' request for mainstream placement at Bullard Talent. The May 26, 2004 IEP offered placement in a general education classroom fifth grade class, with assistive technology of an FM system, DIS of RSP for 60 minutes per day, DHH specialist therapy for 720 minutes per month, speech-language therapy for 8 sessions per month, and a cued speech transliterator. Student argues that Student's lack of progress during the 2004-2005 school year proves that he was denied a FAPE. Student's argument ignores the "snapshot" evaluation of an IEP. According to the proper evaluation, the Court "does not judge an [IEP] in hindsight." *Adams*, 194 F.3d at 1149. The Court considers "what was, and what was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted." *Id.*

At the time the May 2004 IEP was drafted, Student's teacher, service providers and parents all reported that Student had made good progress in academics and speech intelligibility and socialized well with his classmates. Student continued to have the same needs. In May 2004, Student made friends and liked going to school at Bullard Talent. While Student still had difficulty understanding the language in a grade-level mainstream classroom, the IEP team continued to offer IDS ans assistive technology designed to address that difficulty and support Student in the general education setting. Accordingly,

District's mainstream placement at Bullard Talent for most of Student's time was reasonably calculated to provide Student with a meaningful educational benefit.

### 3. Implement his IEP, as evidenced by Student's failure to progress on any goals and objectives

Student alleges that District failed to implement the May 2004 IEP. Student asserts that Ms. Jern admitted that she failed to implement all of the goals and objectives, because there "wasn't enough time" to address some of the goals. In addition, Student claims that Ms. Stover also failed to provide certain modifications and accommodations until the second quarter of the year.

There is no evidence to support Student's failure to implement claims. Student's allegation mischaracterizes Ms. Jern's testimony. Ms. Jern testified that she worked on objectives sequentially and did not work on certain objectives during the first two quarters of the school year. As confirmed by the progress reports, Ms. Jern worked with Student on those objectives during the third and fourth quarters of the school year. Similarly, Student's assertion that Ms. Stover did not implement some accommodations until the second quarter is misleading. Those accommodations–changes to Student's grading and report card–were not developed in Student's IEP until late October 2004. Ms. Stover promptly implemented those accommodations once they were determined. Accordingly, this Court rejects Student's misleading and erroneous allegations regarding a failure to implement the IEP.

### 4. Convene an IEP meeting to discuss parents' concerns (after the October 6, 2004 parent conference) regarding grading, failing to modify classroom work, academics (vocabulary and spelling), and Student's behavior (including assessment and development of a behavior plan), and to review and/or review Student's goals, objectives and services (Signing Exact English (SEE) Sign interpreter)

As discussed more fully above, District did not convene an IEP meeting after the October 6, 2004 conference. Although Student's appeal ostensibly includes this issue, Student fails to assert a meaningful challenge related to a substantive violation of the IDEA for failure to convene an IEP after the October 6, 2004 conference. Student does not challenge the lack of a behavior plan or behavior goals as a substantive issue. Student does not challenge District's failure to provide a SEE interpreter or lack of goals to address signing skills. Moreover, as the ALJ concluded, the Conference Summary notes did not indicate that an IEP meeting would convene to discuss grading, modification of class work, or academics.

Thus, the failure to convene an IEP after the October 6, 2004 conference did not result in a substantive harm to Student, or the loss of an educational opportunity.

**E.    For the 2005-2006 school year, did the District substantively deny Student a FAPE by failing to:**

**1.    Address his unique needs by developing appropriate goals and objectives in the areas of audition skills, audiology, auditory language development, building language, and learning the English language**

Student argues that District's failure to assess Student's audition skills made District unable to develop goals to address Student's unique needs. As discussed more fully above, however, District's assessment of Student was appropriate. The June 2005 IEP contained goals in the following areas: reading comprehension; written language, misarticulations (speech-language goal); prosody/stress (speech-language goal); language expression (speech-language goal); listening skills; understanding of basic concepts; verb usage; attention to interpreter/transliterator; expressing feelings (counseling goal); and conversational skills (counseling goal). After working with Student for a few weeks at the beginning of the year, District staff modified Student's academic goals to better address his needs. The goals of the October 2005 IEP included: reading comprehension/auditory processing; decoding; written language, math problem solving, development of sign language abilities, and attention to sign language interpreter. The goals and objectives in the June 2005 and October 2005 IEPs relate to Student's unique needs, as they are directed at reading, oral language, listening skills, vocabulary development, speaking, language expression and articulation. Dr. Martindale testified that the June 2005 goals were "better" and would lead to progress, but she was unsure that the goals would allow Student to attain a language system commensurate with his typically-hearing peers. As discussed above, the standard of attaining grade level is higher than the standard to provide a meaningful educational benefit. Having considered the totality of evidence, this Court finds that the 2005-2006 goals and objectives appropriately addressed Student's unique needs.

**2.    Offer or provide a program and services that were reasonably calculated to meet his auditory and oral needs, due to the District's offer of a mainstream placement for most of Student's time**

Student again argues that District failed to provide a program reasonably calculated to meet his auditory and oral needs due to the mainstream placement. At the June 2005 IEP meeting, District staff recommended that Bullard Talent would not meet Student's needs. This recommendation was based on

Student's lack of progress during his fifth grade year. After considering various options, District offered, and parents accepted, mainstream placement at Del Mar. District continued to offer supports and services such as an FM system, RSP for 500 minutes per week, DHH specialist therapy for 720 minutes per month, speech-language therapy for 50 minutes per week, a sign language interpreter, and weekly counseling sessions by a counselor assigned specifically to the DHH program.

Having balanced the appropriate factors, this Court finds that District's mainstream placement offer did not substantively deny Student a FAPE. For the 2005-2006 school year, Student continued to have the same needs. In the previous year, Student struggled academically which led to District's recommendation against placement at Bullard Talent. Unlike Bullard Talent, Del Mar had a traditional elementary school schedule, with academic classes spanning the entire school day. This schedule would allow Student to have increased classroom time to learn. In addition, the extensive supports and services offer in the June 2005 IEp were designed to address Student's difficulty in understanding language in the sixth-grade classroom, and to allow him to work on his IEP goals in a one-on-one setting. Student's parents rejected the SDC DHH option. In addition, the team included sign language as a service to supplement and increase Student's learning comprehension. Accordingly, Student was not denied a FAPE by mainstream placement for most of the day at Del Mar for his sixth grade year.

### 3. Offer ESY Services

In the administrative proceedings, Student argued that District substantively denied him a FAPE by failing to offer ESY services for the 2006 summer. The ALJ noted that although Student alleged that district failed to offer him ESY services for the 2006 summer, Student's mother's recollection was refreshed that she had filled out an enrollment form. By Student's mother's testimony, it was established that District offered Student ESY services in a general education summer school program. In this motion, Student has failed to raise any meaningful challenge to this issue. Accordingly, this Court does not disturb the ALJ's conclusion.

**F. For the 2006-2007 school year, did the District procedurally deny Student a FAPE by failing to:**
  **1. Include a general education teacher, a special education teacher, and a local educational agency ("LEA") representative at the IEP meeting on June 21, 2006**

Student argues that the District procedurally denied Student a FAPE by failing to include a general

education teacher, a special education teacher, and a LEA representative at the June 21, 2006 IEP team meeting. The members of the June 21, 2006 IEP team were Student's mother and father, school psychologist Tim Conway, DHH specialist Mr. Nyberg, DHH counselor Renee Nelay, DIS coordinator Lindsey Jessup ("Ms. Jessup"), AV therapist Ms. Sakaguchi, Student's preschool Birney SDC teacher and AV therapist Ms. Aguirre, District Administrator Vicki Allen Westburg ("Ms. Westburg"), and program specialist Karen Dockery.

Procedurally, the IDEA and California state law require the creation of an IEP team to determine the appropriate placement for a student. An IEP team must include "at least one regular education teacher of such child (if the child is or may be, participating in the regular education environment)" and "at least one special education teacher, or where appropriate, at least one special education provider of such child." 20 U.S.C. §§1414(d)(1)(B)(ii)-(iii); 34 C.F.R. §§300.344(a)(2)-(3); Cal. Ed. Code §§56341(b)(2)-(3). In addition, the IEP team must include a representative of the LEA who meets all of the following: (a) is qualified to provide or supervise specially designed instruction to meet the unique needs of individuals with exceptional needs; (b) is knowledgeable about the general curriculum, and (c) is knowledgeable about the availability of resources of the LEA. 20 U.S.C. §1414(d)(1)(B)(iv); Cal. Ed. Code §56341(b)(4).

The ALJ correctly concluded that the June 21, 2006 IEP team included a special education teacher or provider. Mr. Nyberg, who was Student's DHH specialist the previous year, attended the IEP meeting. As Student's DHH specialist during the 2005-2006 school year, Mr. Nyberg worked with Student for approximately one hour per week. Thus, Mr. Nyberg fulfilled the "special education teacher" or "special education provider" requirement. In addition to Mr. Nyberg, the ALJ found that both Ms. Aguirre and Ms. Sakaguchi, as Student's AV therapists, also qualified as Student's special education providers who were present at the June 21, 2006 meeting. Student argues that Mr. Nyberg does not qualify as a special education teacher because he worked with Student for only four hours a month; however, Student does not dispute that Mr. Nyberg was a special education provider within the meaning of the applicable statutes. Accordingly, the ALJ did not err to conclude that the 20 U.S.C. §§1414(d)(1)(B)(ii) and Cal. Ed. Code §§56341(b)(2) requirements had been met.

Similarly, District fulfilled its procedural obligation to include an LEA representative at the June 21, 2006 IEP meeting. Ms. Westburg and Ms. Jessup both attended that meeting. At that time, Ms.

Westburg was the Manager of Special Education for the District. Ms. Westburg signed the IEP as the LEA representative. Ms. Jessup, as DIS Coordinator, was also a District special education administrator, though she signed the meeting as Student's speech therapist. As established by their credentials and testimony, both Ms. Westburg and Ms. Jessup fulfilled the requirements of the applicable statutes as an LEA representative.

Student presents no evidence to contradict Ms. Westburg's or Ms. Jessup's qualifications as the LEA representative. Student argues that Ms. Westburg was not qualified as the LEA representative because when Student's parents asked for AV therapy for the summer session, Ms. Westburg responded that the request "would need to be looked at in a more in-depth fashion" and that there was a process "that needs to be started in the spring that would be presented to the board of education." Student does not explain how Ms. Westburg's statement disqualifies her as an LEA representative. As set forth above, an LEA representative must be (a) qualified to provide or supervise specially designed instruction to meet the unique needs of individuals with exceptional needs; (b) knowledgeable about the general curriculum, and (c) knowledgeable about the availability of resources of the LEA. 20 U.S.C. §1414(d)(1)(B)(iv); Cal. Ed. Code §56341(b)(4). Ms. Westburg's statement demonstrates that she was knowledgeable about the availability of AV therapy as a resource, in that she explained the appropriate process to follow to make that resource available. Moreover, action was taken on Student's request. Student's AV therapy request for the summer was denied at the meeting, and the IEP team commissioned an assessment on Student and AV therapy which was completed in August. Additionally, Ms. Jessup may fulfill the requirement as an LEA representative despite that fact that she appeared as Student's speech therapist. *See, Napa Valley*, 496 F.3d at 938, n.6. Accordingly, Student's assertion that District failed to include an LEA representative at the June 21, 2006 IEP team meeting is meritless.

As to a general education teacher, the ALJ found that although no general education teacher attended the June 21, 2006 IEP meeting, District did not procedurally deny Student a FAPE, significantly impede the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE, or cause a deprivation of educational benefits. Because Student was participating in the general education environment, and may have continued to do so, District was required to provide a general education teacher as a member of the IEP team. There is no dispute that no general education teacher

35

attended the June 21, 2006 meeting.  District argues, however, that the June 21, 2006 meeting was a continuation of the May 26, 2006 meeting, and that all topics related to general education had been previously addressed at the May 26 meeting, and any procedural defect was cured by the September 1, 2006 meeting.

Student's sixth-grade general education teacher attended the annual IEP meeting on May 26, 2006. At that meeting, the IEP team discussed several topics, including Student's grades, scores on the Woodcock-Johnson III academic testing, present levels of performance, placement options, progress on past goals and objectives, and the creation of new goals and objectives.  The notes from the June 2006 meeting state that it was a "continuation of the 5/26/06 IEP."  A general education teacher from Ahwahnee attended the September 1, 2006 IEP team meeting.  At the September 1, 2006 IEP team meeting, as discussed more fully below, Student was offered placement in an SDC program at Ahwahnee with mainstream placement for physical education and an elective, such as art.  The general education teacher attending the September 1, 2006 IEP team meeting was an art teacher.  Based on these facts, the ALJ concluded that in developing Student's IEP form the 2006-2007 school year, the IEP team had input from general education teachers knowledgeable both about Student and about the mainstream component of the District's proposed placement.  Accordingly, the ALJ ruled that the procedural violation was harmless error.  For the following reasons, this Court agrees.

A properly constituted IEP team is important, because it develops "an IEP which addresses the unique needs of the child." *Amanda J.*, 267 F.3d at 892.  "A properly constituted IEP team is in the best position to develop an IEP that suits the peculiar needs of the individual student." *Napa Valley*, 496 F.3d at 941. As set forth above, Student is denied a FAPE "only when the procedural violation results in the loss of educational opportunity or seriously infringes the parents' opportunity to participate in the IEP formation process." *W.F. v. Bd. of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992).  "[N]ot all procedural violations deny the child a FAPE." *Napa Valley*, 496 F.3d at 938. "Where a school district improperly constitutes an IEP team, 'IDEA procedural error may be held harmless[.]'" *Id*. (quoting  *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 652 (9th Cir. 2005)).

This Court finds that the absence of a general education teacher at the June 21, 2006 meeting was harmless error.  Student argues that a general education teacher was necessary at the June 21, 2006

36

meeting for the IEP team to understand Student's needs, modifications and interventions, and the appropriate delivery of instruction to ensure that he listens and learns to listen. District counters that these topics were discussed extensively at the May 2006 meeting, at which a general education teacher was present. Student's parents attended the May 2006 meeting and asked questions about general education options. District further points out that by the June 2006 meeting, Student's parents had eliminated the only general education placement option that the IEP team contemplated at the May 2006 meeting. Thus, the importance of a general education teacher perspective in developing an IEP for Student lessened. In addition, according to Student, the June 21, 2006 meeting "focused on whether the school district would cover lessons on AVT during summer." The AV therapists present at the June 2006 meeting, Ms. Aguirre and Ms. Sakaguchi, appeared at the request of Student's parents to discuss this topic and to share their expertise with the IEP team. Aside from a personnel training issue, which was addressed by the LEA representatives at the meeting, no topics discussed at the June 2006 meeting pertained specifically to the mainstream placement. Moreover, at the September 1, 2006 IEP meeting, all required members attended. In light of these circumstances, this Court is not persuaded that the absence of a general education teacher at the June 21, 2006 meeting resulted in the loss of an educational benefit to Student. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49 (2005) (party seeking IDEA relief bears burden of persuasion).

### 2. Offer a special education program prior to the start of the 2006-2007 school year

The IDEA and California Education Code require that at the beginning of each school year, the LEA shall have in effect an IEP for each child with a disability. 20 U.S.C. §1414(d)(2)(A); Cal. Ed. Code §56344(b). Pursuant to the IDEA, District must make a formal, specific written offer of placement. *Union Sch. Dist. v. Smith,* 15 F.3d 1519, 1526 (9th Cir. 1994). "The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later about when placements were offered, what placements were offered, and what additional educational assistance was offered to supplement a placement, if any." *Id*. "A formal, specific offer from a school district will greatly assist parents in 'presenting complaints with respect to any matter relating to the . . . . educational placement of the child.'" *Id*. (quoting 20 U.S.C.§ 1415(b)(1)(E)).

The offer of placement for the 2006-2007 school year was discussed extensively at the May 26,

2006 IEP meeting. The team discussed placement at the oral DHH SDC at Ahwahnee, or a mainstream placement at Fort Miller, Baird, or Bullard Talent. District recommended placement at Ahwahnee. Student's mother visited the Ahwahnee classroom after the May meeting, but chose not to visit Fort Miller because she was not interested in that placement. At the June 2006 meeting, District made clear that its offer would be at Ahwahnee. Student's parents remained undecided about whether they agreed to this placement. Student's mother testified that she was aware in June 2006 that District was offering Student placement in the DHH SDC at Ahwahnee, but that she wanted more time to explore other schools. This Court agrees with the ALJ's assessment that by the June 2006 meeting, the "District proposed a program to be put into effect, but Student's parents chose not to consent to it." District attempted to schedule an additional IEP meeting in July 2006, prior to the start of the school year, but Student's parents could not attend. On August 25, 2006, Student's mother sent a letter to District providing notice that Student's parents were placement Student at Clarke unilaterally. District extended the formal written offer of placement at the September 1, 2006 IEP meeting, three days after the start of the 2006-2007 school year.

The ALJ found that District's failure to provide Student a formal, written FAPE prior to the 2006-2007 school year was cured by the September 1, 2006 formal written offer. The ALJ reasoned:

> Because the parents actually knew what the offer was, had already decided not to accept it, and received the formal written offer a few days into the new school year, the provision of the formal written offer a few days after the start of the new school year was harmless error and did not impede Student's right to a FAPE, significantly impede the parents' opportunity to participate in the decision making process regarding the provision of a FAPE, or cause a deprivation of educational benefit.

The Court notes that "a school district cannot escape its obligation under the IDEA to offer formally an appropriate educational placement by arguing that a disabled child's parents expressed unwillingness to accept that placement." *Union Sch. Dist.,* 15 F.3d at 1526. Thus, even if Student's parents expressed an unwillingness to accept the Ahwahnee placement in June 2006, and sent a letter that Student would be placed at Clarke for the 2006-2007 school year, District was still required to make a formal written offer of placement to Student. The circumstances of this case, however, are distinguishable from those in which a District fails entirely to make a formal written offer. *See, Union Sch. Dist*, 15 F.3d at 1526 (discussing procedural denial of FAPE for failure to make formal offer). Here,

District convened IEP meetings in May 2006 and June 2006 to discuss placement options.  District make clear what its offer of placement would be, and Student's parents understood those options.  District attempted to convene another IEP meeting in July 2006, but Student's parents were unavailable.  On September 1, 2006, when an IEP team was able to convene with all team members, District made its formal written offer.  Thus, District did not seek to avoid its obligation under the IDEA to extend Student a formal offer.

The Court finds that District's failure to make a formal written offer prior to the beginning of the school year was harmless error.  Student asserts that "not having an IEP in effect at the beginning of the school year significantly impeded the parents' ability to fully participate in their son's IEP process, and it denied [Student] educational benefit."  This Court finds that Student's parents fully participated in the IEP process, as evidenced by their participation on the May and June 2006 IEP team meeting placement discussion and Ahwahnee visit.  Similarly, Student's parents had enough information about District's offer of placement to determine the appropriate placement for their child through the May 2006 and June 2006 IEP meetings.  Because a formal placement was offered, there is no factual dispute about what placement and services were offered, and parents were able to present complaints with respect to the placement matter.  Indeed, Student's parents filed a due process complaint on the day the formal written offer was made.  Finally, Student does not articulate how the formal placement offer made three days after the beginning of the school year denied Student an educational benefit.  Such argument would be difficult in light of Student's placement at Clarke.  Accordingly, District's failure to provide a formal written offer of placement prior to the 2006-2007 school year did not procedurally deny Student a FAPE.

> **3.** **Invite to the September 1, 2007 IEP meeting an individual who could interpret the results of Nancy Sakaguchi's auditory verbal ("AV") assessment dated August 23, 2006, and its attached amendment dated August 29, 2006?**

Student alleges that District violated IDEA procedures by failing to invite someone who could interpret Ms. Sakaguchi's assessment to the September 1, 2006 IEP meeting.  At the June 2006 IEP meeting, District indicated that it needed to conduct an assessment to determine whether AV therapy was appropriate for Student.  District hired Ms. Sakaguchi, Student's private AV therapist, to conduct the assessment. Ms. Sakaguchi completed her report on August 19, 2006.  She issued an amended report on

August 30, 2006.

An IEP team shall include an individual who can interpret the instructional implications of the assessment results. 20 U.S.C. §1414(d)(1)(B); Cal. Ed. Code §56341(b)(5). This may be one of the other statutorily mandated members of the IEP team, or another individual who has knowledge or special expertise regarding the student. *Id.* There is no dispute that District invited Ms. Sakaguchi to attend the IEP meeting, but she was unable to attend. Among the members of the September 1, 2006 IEP team were Mr. Conway, Mr. Nyberg, Ms. Jessup, Ms. Shroeder, Ms. Slonski, DHH SDC teacher Carolee Clayton, and audiologist Cindy Yates. On this issue, the ALJ found that:

> Testimony from Ms. Schroeder established that the IEP team members including herself, Ms. Yates, Ms. Slonski, and Ms. Jessup were able to interpret Ms. Sakaguchi's report. By the end of the meeting, the team members did not have any unanswered questions about the report. Ms. Shroeder had spend a significant amount of time discussing the report with Ms. Sakaguchi over the telephone prior to the September 1, 2006 meeting. As a result, Ms. Shroeder was knowledgeable about the report and its recommendations, and was able to share that knowledge with the IEP team.

This Court agrees with the ALJ that there is "no persuasive evidence indicating that members of the September 1, 2006 IEP team were unable to interpret Ms. Sakaguchi's report." In his argument, Student dismisses the statements of Ms. Shroeder, Ms. Yates, and Ms. Slonksi and assigns more credibility to Student's mother's statement that there were comments made indicating a lack of understanding as to what was meant by the report. However, Student's arguments are "impermissible attempts to second-guess the [ALJ's] characterization and weighing of the evidence." *Napa Valley*, 496 F.3d at 942. Because this Court affords deference to the ALJ's thoughtful analysis, and agrees with the ALJ that members of the IEP team were able to interpret Ms. Sakaguchi's assessment results, this Court dismisses Student's arguments on this issue. *Id.*

**G.    For the 2006-2007 school year, did the District substantively deny Student a FAPE by failing to address his unique needs by developing appropriate goals and objectives in the areas of audition skills, audiology, auditory language development, building language, and learning the English language**

Student argues that District's failure to assess Student's audition skills made District unable to develop goals to address Student's unique needs. As discussed more fully above, however, District's assessment of Student was appropriate. The September 2006 IEP contained goals in the following areas: expressive/receptive language (semantics/syntax); expressive/receptive language (vocabulary);

40

expressive/receptive language (syntax/semantics); speech articulation; reading comprehension; written language; math comprehension; and peer interaction/pragmatics. These goals and objectives relate to Student's unique needs, as they are directed at reading, oral language, listening skills, vocabulary development, speaking, language expression and articulation. Dr. Martindale testified that these goals were "fine," but there were not enough auditory goals. The discussion above applies here. Having considered the totality of evidence, this Court finds that the 2006-2007 goals and objectives appropriately addressed Student's unique needs, and Student was not denied a FAPE.

CONCLUSION AND ORDER

For the foregoing reasons, this Court:

1.      DENIES in full Student's motion for summary judgment;

2.      DISMISSES Student's IDEA claim; and

3.      SETS a scheduling conference on May 19, 2009 at 9:00 a.m. in Courtroom 9 (DLB). The parties must file a joint schedule conference report no later than May 17, 2009.

IT IS SO ORDERED.

**Dated:    April 27, 2009**               **/s/ Lawrence J. O'Neill**
                                    UNITED STATES DISTRICT JUDGE